Wood v. Siemens Medical, Case No. 25-864. Mr. Feldman, whenever you're ready. Good morning, Your Honors, and may it please the Court. Brian Feldman with my partner, David Farber, on behalf of Appellant Mary Wood. This False Claims Act complaint should not have been dismissed at the pleading stage. The complaint details, first, that Siemens knew it was shipping dangerously unreliable devices through its shipping channel. Second, that from start to finish, that's established by Siemens' own scientific studies. Third, that it was nevertheless lying to the government to win contracts. And fourth, that Siemens also caused unwitting doctors to make false certifications under the False Claims Act. To begin with, scienter, what's remarkable in this case is that unappealed scienter, which is usually the first point that defendants shoot at, is not even challenged because the evidence by audio recordings and by contemporaneous emails shows that Siemens knew it was shipping these dangerous devices. Nancy Taylor, the head of quality for shipping distribution, explained they were in dire need of a new solution because right now they were throwing a random amount of dry ice into the shipper and hoping the devices worked when they got there. The complaint describes a cover-up by her and her bosses all the way up the chain. And very importantly, at paragraph 164, explains why they got away with it. That paragraph of the complaint is where the relator and Nancy Taylor have a conversation about how they can justify this. And Nancy Taylor says, the easiest way to justify continuing to ship is to point to what Siemens points to today, that no doctor figured out what was going on and complained to the FDA. But what they explain in that paragraph is, of course they don't. The reason the unreliable tests are so pernicious and dangerous is because they're feeding into diagnoses. Most of the time, the doctors aren't going to realize that there's a problem. That's Siemens' own conclusion in its FMEAs. Is your argument that there's many unknown or unknowable defective tests out there and errant test results, and that's why you don't allege any specific claims that were false? Let me start with the second part of the question. I'm not sure you've alleged that any specific claims were submitted that were false. In other words, connecting the submission to the delivery and the defective test. Correct me if I'm wrong on that. So the complaint does. Your Honor, they're the direct claims, right, where the contracts are identified, the purchases are identified, and the fraudulent inducement or the delivery of those defective devices to the government is a false claim. So that's the direct claims. I think you're referring to the indirect claims, and it's true. Just on the direct, I mean, in terms of specificity of defectiveness, right, I understand there to be allegations that there are instances of temperatures being outside of the proper range. But I also understand that there are different devices, different temperatures, and duration of time by which it would have to be out of range in order for it to be defective. So I guess the question to me for specificity is don't you have to show any instance of actual defectiveness due to – starting with actual defectiveness due to the shipping temperatures from which a false claim was submitted. So where do I look to in the complaint for any specificity of actual defectiveness due to the temperature being out of the temperature range, or don't I need to look for that? No, the complaint has that, Your Honor. So Siemens Science, one of the important tests they did, and this is recorded in the A4, which is described in the complaint and is attached to an appendix starting at 1294. Siemens did stress tests, studies on each of its devices to determine whether it could – a frozen device could still properly function if it was exposed to thawing temperatures, or a refrigerated device could properly function if it was – First, over a – am I correct that the stress test included over certain periods of time? So some of the stress tests did, but one of the stress tests, the one we're referring to, is a freeze-thaw test, which was an incident of freezing and thawing. Okay. So then where do I look for the specific instance of that device being subject to the freezing necessary to – from which one could infer defectiveness and a claim filed with respect to that? Certainly. Just to be clear, there are hundreds of those devices. They're indicated with rise and fall codes only where Siemens has that data. That's what the DQSP-33 says. So those hundreds of devices are all subject to being unreliable by Siemens' own scientific analysis when they freeze or when they thaw. And the second part of that is the bioconvergence and ISC tests, which are described in the complaint, paragraphs 125 through 141, looked at the actual regular customary shipping conditions of these devices and found that no matter what time of year, winter or summer, no matter what size shipper, they were exposed to the prohibited temperature. So this is nearly universal. I think the first part of your answer, you said there's hundreds of specific IVDs that were defective because of the temperature changes. What contracts were those connected to? Those are – Is there an allegation in the complaint that connects a specific contract to a specific defective IVD? Absolutely. The contract – some of them are included in the complaint. The VA contract in Exhibit 2 has a long list of devices which overlap with and include the troponin device. And that were defective because of the shipping? And that were defective because of the shipping. Okay. Can you show me where – point me to the paragraphs in the complaint? If I could, I'm about to show you where that specific – it's in Exhibit 2. It's the VA contract. Exhibit 47 is the naval contract with the Emmett II 6AM device that we described. And Exhibit 3 is a laundry list of devices that are ordered and purchased by various agencies. The issue here is – And some of those items that are specified in there were ones that were subject to the practices, the shipping practices, and resulted in tests that were defective. Yes, Your Honor, because all of their devices were subject to those shipping practices. And many, if not most, of the devices were subject to failure. Subject to failure. Yeah, I guess we're not quite communicating here. It sounds like what you're saying is they must have been because of the statistics. No, I'm sorry. Let me be clear. I think it's my language, Your Honor. What Siemens tested and concluded, and this is in, for instance, paragraph 148 of the complaint, is that the troponin control, for an example, which is a device that is meant to be kept in frozen temperatures, that if it is exposed to thawing conditions, it cannot function properly. By cannot function properly, that means it's not reliable. We're talking about precise and accurate diagnostic tests. I guess, don't you need to show that it was exposed to those and it did not function properly? We do show that it was exposed to those conditions. And that it did not, as a result, function properly. Yes, this is Siemens' scientific conclusions added together. Siemens tested on the one hand what happens when we expose a device that's frozen, like this troponin control, to thawing conditions. They concluded if we do that, it does not function properly. They did that for hundreds of devices. They're listed with the rise and fall codes in the A4, which is at JA 1294 of the complaint. They came to that conclusion. In fact, their own, this is in paragraph 147, their own policy said we're only going to assign that rise or fall code that says must remain frozen or must remain in two to eight degrees if we've got the data to back up, that it must stay in those conditions to function. So they did that work. That was their stress testing. And then they looked to see what's actually happening with these devices in real time. And they put thermometers in their shippers. This is the Bio-C and ISC testing from 2009 to 2015. And they found no matter when we send it, summer or winter, no matter whether it's a small shipment or a big shipment, it fails every time. And the most striking of this- Wait, it fails, just to be clear, when you say it fails, you mean there was a temperature excursion as opposed to the device fails? Yes, there was a temperature excursion. Separate studies conclude that the device, therefore, is unreliable. You just add them. It's one plus one equals two here. And paragraph 134 gives an example. In the winter, right, bioconvergence tested, will a frozen device that we send in the winter, cold, right, stay frozen or be exposed to thawing conditions? And they were quickly, at every service level, FedEx overnight, FedEx today, FedEx ground, exposed to thawing conditions. That includes the troponin and all these other devices rated on the A4 as unreliable. And at the end of the day, we're talking about devices that a doctor is using in a diagnosis, which is why Siemens itself in its FMEAs, and this is in paragraphs 103 through 111 of the complaint, those are redacted largely, but this is Siemens' assessment of what happens if we do just this. If we send these devices in shipping temperatures to which they're not allowed to be exposed, what will happen? And Siemens says we are likely to have major consequences, such as missing a heart attack. Again, what's unique about this complaint and distinguishes it from the cases like you is that the relator is not speculating about harm. Siemens doesn't challenge. They understood this harm. That's the scienter bit. But it's also Siemens science from beginning to end here. That's what this case is built on. At a different stage in litigation, we can have a battle of the experts about whether Siemens was right, whether there are nuances to that science, but this complaint is built on Siemens science from beginning to end. Thank you, Mr. Goldman. You're reserved a couple minutes for the vote. Good morning, Your Honors. May it please the Court. My name is Josh Goldberg with Patterson Belknap. We represent Siemens in this case. Your Honors, the district court properly dismissed relator's complaint. Her fifth attempt in two districts to try to bring claims against Siemens under the False Claims Act based on how Siemens ships its medical devices. As the district court properly held, relator failed to plead her claim with particularity as required by Rule 9B. And as the district court further held, relator failed to allege that any alleged shipping deviation by Siemens would have been material to any government payment decision, even if relator's allegations were true. Under Rule 9B in the holdings of this court, a plaintiff asserting a claim under the False Claims Act must allege an actual false claim, not speculation, not generalities, but the details of a specific claim that was fraudulently submitted to the government, and relator failed to do that here. In all of her pleadings, relator has never identified even a single test that was damaged because of how it was shipped by Siemens, much less a test that was then used on an actual patient sample, much less a test that was then submitted by the lab for government reimbursement. So, counsel, in their briefing, your opponent, the plaintiff seems to have shifted the focus to this idea that the false claim is that the promise was of reliable tests. On argument, we started right back to defective devices, but let me ask you, even though their focus and argument has been on the device being actually defective, would that be a viable theory, this idea that the promise was to provide tests that had been kept in a certain condition, and what was provided was a test that had not been kept in that condition? Is that sufficient? No, Your Honor, it's not, and you're right that relator did shift to that theory on appeal. It's not an argument that they really pushed below. But the whole concept that a device that consistently accurately produces accurate results could be unreliable is sort of nonsensical, and in this case, in which the importance of the device is whether it provides reliable results when it's put through the lab and it's given to the doctor for diagnostic purposes, the relator's failure to allege even one, even a single test failure of literally billions of tests that were shipped during the relevant time period makes, you know... So we can reverse engineer the idea that they must not have been unreliable if they didn't actually fail? In part, Your Honor, I think I would look at it more in terms of its relator's burden to properly allege with particularity that there was a false claim, and a relator cannot meet that burden by sort of falling back on, although I don't have any proof of this, I'm saying that it's unreliable for these various speculative reasons, and I think the court has dealt with this in the Griffles case, for example, and there's other cases from other circuits in which there were, say, violations of CGMP requirements or other FDA regulations, and the argument by the relator was, well, given that, how can anybody be sure the device or the pharmaceutical is working correctly? And the answer from the courts was, this is a false claims act case, it's not an enforcement action, and in a false claims action, to go forward, the relator must come up with something specific. Your Honors, I think it's also notable, and Judge Merriam, I think this goes to your question in part, it's not just that a relator has failed to affirmatively allege any specific false claim in this case, the relator's own pleadings, including the complaint and the exhibits attached to it, actually show the opposite of a false claim. As alleged in the complaint, Siemens conducted an extensive review of its complaint history when these issues were raised by the relator during the brief period in which she was a contracted employee, and nothing in that complaint review revealed any tests that it failed because of the way Siemens had shipped the products. In addition, in connection with, I believe it was her fourth attempt to come up with a complaint, the relator relied on a series of mod reports, those are medical device reports that are filed publicly with the FDA, which all labs, private and government, and all manufacturers are legally required to file in any instance in which there's been a device failure, any instance in which a device has generated an inaccurate result. And the relator put thousands of those into the record and suggested, much like a counsel is doing here today, saying, well, there must be a problem because of these things. None of those related to device failures because of temperature excursions. And do we know if any of them were delivered to government agencies? I mean, do we even know whether those reports could have formed the basis for a false claim, in addition to the point that you're making? I don't think we do, and I don't think the relator has alleged that. In fact, I think the only inference that would be plausible to draw would actually be the opposite because those would be instances in which the testing lab discovered an issue and reported it. And in that case, it would not have reported the patient result to the doctor and would not have sought reimbursement. I think that actually brings me to another point that counsel made that nobody could know. And he referred to the doctors. The doctors wouldn't know. The doctors really are not the relevant parties here. It's the labs. The labs are all required under – they're called the CLIA regulations. Those apply to both private and government labs. Those CLIA regulations require every laboratory who's using medical diagnostic devices like this to conduct inspection of deliveries as they come, to look for things like, is it very hot? Is it too cold? Has the box been damaged? But then they also must at very regular intervals conduct quality controls and calibrations. All of that is to determine that before they put any of these IBDs onto an analyzer and run a test, it's to confirm that the test is reporting accurate results. Can I ask related to that? I don't know if it's in the record, the allegations. If the lab receives an IBD knowing that it was subject to temperatures that take it out of its range sort of as required, can the lab – is the lab then tested to see if it works or is it just that it can't use it anymore because it knows it's fallen out of the appropriate temperature? I believe it would come down to the lab's own requirements and it would be what's within the CLIA regulations. My understanding is if the lab believes for any reason that the device is not going to function properly, then it wouldn't use it on a patient sample. But the fallback would be, again, before it puts it onto a machine to actually interact with a human sample, it runs against quality controls and calibrations to make sure that it's returning the result that would be expected. Your Honor, Judge Nathan, I think it also goes to another point that counsel made. He referred to, and I believe in response to Judge Park's question, if there were any government contracts. And he referred to one government contract. There's one contract with a provision that they specifically focus on. It's for the EMIT-II, which is a VA contract. I actually think it's with the Navy. And I think it's actually instructive here because I think it actually highlights the flaws with related claims. Counsel suggested that, well, that's one that went to the government. And therefore, if there had been stress testing and if there had been failures, that would suggest and you could infer that that device may have failed and that therefore you can speculate that perhaps there could have been a false claim submitted. If you look at relators' own allegations, and I think counsel referred to some of the exhibits, I believe it exhibits four and six to the second amended complaint, which is at JA-1402, beginning there. The EMIT-II is actually quite interesting because the EMIT-II was in fact subjected to stress testing and it very much passed. And so specifically, the EMIT was subjected to testing for up to 75 degrees Fahrenheit, much higher than what any of these tests would be expected to encounter, for at least 48 hours and then freezing temperatures for a total of 17 hours. And what those exhibits show is that even in that extreme circumstance where it's encountered that type of excursion, the test works, it functions, and it consistently returns accurate results in Siemens' own stress testing. Is that a materiality argument that the government, even if this happened and the government knew and so it wouldn't have affected the reliability of tests and therefore wouldn't have been a condition of payment? No, I don't think there is a materiality argument here, which I can refer to in a second, but I don't think it's a materiality. You think it's falsity? It's just falsity. There has been no violation. The regulation speaks in very general terms as to whether the company is taking steps to protect the device during the customary conditions of shipment. If during the customary conditions of shipment the device is not failing, by definition the regulation has been complied with. And so I think this test shows an example, and there are many. Counsel referred to hundreds of assays. All of these assays are submitted to that type of stress testing. They are tested to extremes. And then that testing informs how Siemens actually ships them. Just briefly, Your Honor, with regard to materiality, if I have a moment. I see my time is up. Go ahead. With regard to materiality, there is no dispute in this case. In fact, affirmatively alleges in the complaint that in the almost decade in which these claims have been pending, the government has continued to pay for these devices, has never sought to recoup anything on these devices, and in fact has entered into new contracts, all with allegations that the government has put, it was brought to the government's attention almost a decade ago that supposedly billions of tests were being shipped in unsafe conditions. In the Escobar case, the Supreme Court talked about the situation in which the government continues to pay. We submit this is exactly that kind of case. The relator has not alleged that the government has ever taken action against Siemens, and it is not alleged that the government has ever taken action against any manufacturer for shipping products in this manner. Unless the court has any further questions, Your Honors, the relator has had ample opportunity to prove her and to plead her case. She has proven unable to do so. We therefore urge the court to affirm the district court's opinion. Thank you, counsel. We'll hear rebuttal. Thank you, Your Honors. To answer the question about specifics alleged in the contracts, I point the court to paragraphs 87, 91 through 92, which identify contracts that included the troponin assay that was an example. In respect to Your Honors' question to Miriam about defective versus unreliable, they're defective because they're unreliable, right? What is being ordered by the government are tests to decide whether you have cancer or the level of troponin in your blood. If those are not reliable, that's a defective test. It's one of the same. There's this conceit that Siemens comes back to over and over again, which was part of the cover-up, paragraph 164, which is nobody's complained. No lab could ever know what Siemens knows unless they had Siemens stress tests and knew the devices could not be exposed to freezing and thawing conditions and still function. That was the test. Unless they knew how these devices were actually shipped, which only Siemens knew. You can't just test the devices for effectiveness or defectiveness? What I'm saying, Your Honor, is a lab could test a device for defectiveness at the time they receive it, but they wouldn't be able to attribute a cause. So presumptively all of the devices were, under your theory, your sort of statistical theory, all of the devices they received from Siemens have been discarded? Or unreliable. That's Siemens' own internal policy. It says quarantine these devices if they've been exposed to freezing or thawing temperatures. Do you agree that labs are testing them? No, that's not in the complaint. Foreman and Strokes says the court cannot, on a motion to dismiss, consider this CLIA argument that's not in the pleadings, and it's asking this court to make a lot of assumptions, that CLIA actually has some control that tests for this, which there's no evidence about that even alleged by the other side. Counsel wasn't sure about the answer to that question. No, but I understand the point of connecting it, but under your theory, they're all defective, because it's basically a statistical argument. That's correct, Your Honor. So they would all be defective. To the extent any labs are testing, and I understand the argument that this is not in the complaint, so I hear you. But under your theory, all of those devices would just be discarded were they tested, because they would show to be defective, even if the lab had no idea what the cause for the defective is. That's right, and that's consistent with the thousands of reports of defective devices in the MAW data that can't attribute a cause to it. This is a motion to dismiss of a case that is not built on speculation. It's built from beginning to end on Siemens's own science. One last point on materiality, Your Honors, which is that this materiality argument that Siemens has made over and over again is foreclosed by this court's case informant. At page 115, this court said on a motion to dismiss, it is not a viable argument that the government continues to purchase. Informant was an extreme case where the defendant actually had documents showing the government knew the facts, and the court said that can't be permitted, it's not in the complaint, and we will not allow an argument that the filing of a key tab and the investigation of a key tab creates government knowledge. There is materiality here because the reliability of these tests is exactly what the government was paying for. Thank you, counsel. Thank you both. Thank you, Your Honors.